Good morning. Good morning. May it please the Court and Counsel, my name is Larry Gangness. I have the privilege and honor this morning of appearing before you on behalf of Cutter and Buck. Keep your voice up. Yes, Your Honor. On behalf of Cutter and Buck, the policyholder in this D&O insurance carpet case. In its brief, Genesis points to the terms of its August 14, 2002 renewal policy binder and argues that the terms of the binder are outcome determinative in this case. We agree. Because the binder was the insurance contract that was in effect and providing coverage to Cutter and Buck and its directors and officers when the securities lawsuits were filed against them and tendered Genesis before Genesis sent its December 2002 rescission notice. I would therefore like to focus first on two fundamental legal principles that apply to insurance policy binders. And with that background, apply those principles to the timeline of key events surrounding Genesis' decision to issue the binder and show how Genesis' rescission and denial of coverage for the securities suits breached the binder's terms. First, a binder is a separate contract of insurance that provides immediate interim coverage to the insured while the insurance company decides whether to issue its formal policy. Second, a binder's coverage cannot be rescinded or terminated retroactively except under two limited circumstances. A, the binder clearly and unambiguously permits the insurer to do so and then only to the extent expressly provided in the binder, or B, if the insurer was fraudulently induced to issue the binder in the first instance. I've handed copies of the binder that highlights key provisions of it, along with the 2002 rescission notice. Let me ask you a question. Yes, Your Honor. You know, I thought that I read the briefs very carefully, but maybe I didn't. I don't know. This precise argument that you're I don't recall that being fully flushed out in the briefs. Did I miss something? Yes, Your Honor. We didn't address it directly in our opening brief, but Genesis raised it in its answering brief when it asked this Court to affirm the district court on an alternate ground on a new theory that was articulated for the first time. You're now suggesting that this is a solid argument for you on which to affirm, to reverse. Absolutely, Your Honor. You will note that Genesis issued the binder on August 14, 2002. Right. To appreciate the full significance of the binder, you have to place Genesis' decision to issue it in context. On August 8, Genesis' 2001 policy expired, and Genesis had agreed in a one-paragraph letter to renew or extend the expired policy. Four days later, on August 12, Genesis learned from Cutter and Buck's press release that Cutter and Buck would be having a meeting with the district court on a new theory that Cutter and Buck had intentionally circumvented its accounting controls. Genesis has not challenged the district court's finding that armed with this information, Genesis then knew the facts entitling it to rescind. What did Genesis do when confronted with Cutter and Buck's public admission of accounting fraud? Genesis made the business decision, after due deliberation, that Cutter and Buck to renew and accept a triple premium, and it used its August 14 renewal policy binder to dictate the specific terms of its commitment to provide Cutter and Buck with insurance coverage from that date forward. It's also important to remember that Genesis has never claimed that it was misled in its decision to issue the binder, or that it was fraudulently induced to issue it, because, as the district court found, Genesis learned the facts entitling it to rescind two days before it issued the binder, and elected instead to renew Cutter and Buck's cover. Let me ask you this. When did Genesis learn that Loebert intentionally made false statements in the application? When did they learn that fact? Genesis understood. Not when they understood. When did they learn that piece of information? They learned that piece of information from reading the press release. Did the press release say that Cutter knew or, you know, that Loebert had made these false statements with the intent to mislead? The press release pointed out that there was evidence that the accounting controls had been intentionally circumvented, and that Mr. Loebert had resigned on August 9th. Genesis knew from the August 1 conference call that Mr. Loebert had been fired, because it had been told during the conference call that he would be staying on until a new CFO was hired. But, you know, people are fired, unfortunately, a fair amount in this type of business. So, I mean, how does that that's not the same thing as misrepresentations in the application. Well, Genesis also knew from the press release that the distributor transactions had been consignment sales, which meant that there had been no right of return for them. Mr. Loebert had told Genesis during the August 1 conference call that he knew about the distributor transactions when they were made in 2000, because he booked the revenue, and he had told Genesis that there were no rights of return. So Genesis knew from the press release that Mr. Loebert had lied on August 1. And as we know from their own internal documents, Genesis understood from the press release, reading it, that Mr. Loebert had been involved in the intentional misstatement of the financial statements and in the accounting fraud. So, essentially, your position would be once they knew it was a liar or that something was amiss, then that they waived any right to rescind if they didn't do it right there. Our position is that Genesis knew that it had been lied to on August 12 after it issued the press release. And with that knowledge, it went ahead and issued a new document, a new contract, the policy binder. And in doing that, it ratified everything that it had heard previously. Well, the terms of that are not disputed. But isn't it disputed as to what they say why they, you know, the reason that they issued a different contract and your inference is that the reason they issued a different contract is because they knew that they were higher risk and, therefore, they were doing that. Don't they have some other explanation in the record? No. There's no dispute about the terms of the policy binder. No, there's no dispute about the terms of it, but why it costs more money. You say one thing and they say another thing, don't they? Well, that's irrelevant, too, because the binder Well, I don't think we need to I think that could be, it could be a disputed fact, but I don't think it's material as to resolving the summary judgment. That's correct, Your Honor. In the binder, Genesis dictated the terms under which it would provide immediate coverage to Cutter and Buck going forward and the terms under which it would agree to issue the formal extension. And the binder itself only reserved to Genesis a right to rescind under two circumstances. Those are highlighted in red on page two of the copy I handed to the court at excerpts of Record 40. And the first of those two rescission provisions never arose because Cutter and Buck submitted the renewal premium to Genesis before the August 29 due date. The other provision gave Genesis the option to rescind at its election if it did not receive Cutter and Buck's renewal application materials by August 29. Now, there's no dispute that Cutter and Buck was unable to submit all of those renewal application materials by the due date. But it's also undisputed that Cutter and Buck submitted the remaining application materials on November 6, and Genesis exercised this rescission option and therefore waived it. Well, so they waited until December, right, to exercise it? I didn't understand that. When did they exercise their rescission? December? They sent the rescission notice on December 6, 2002. And that rescission notice was not based on any condition specified in the binder. For example, the conditions highlighted in yellow in the binder were the conditions under which Genesis agreed to issue the 2002 policy extension. Genesis did not rescind based on any of those conditions. For example, it did not rescind because the renewal application materials were available. Genesis did not rescind the binder. Nevertheless, the district court dismissed Cutter and Buck's claim that Genesis had wrongfully rescinded and breached the binder. And the fundamental flaw in its analysis was that it focused on the wrong insurance contracts. It held that Genesis had properly rescinded the prior year's policy, even though it had expired on August 8, six days before Genesis issued the policy binder. And even though the prior year's policy was no longer providing coverage when the first security suit was filed one month later. The court also held that Genesis properly rescinded the 2002 policy extension, even though Genesis never issued it. This was error because the policy binder was the insurance contract that was, in effect, governing the policy and providing coverage when the security suits were filed and tendered to Genesis. And Genesis weighed the only rescission option it had in the binder and, therefore, breached it when it rescinded and denied coverage for the securities lawsuits. I'd like to reserve my remaining time for rebuttal. That's fine. Thank you. Standish, and I represent Genesis Insurance Company. Under Washington law, Genesis was not allowed to rescind the policy issued to Cutter and Buck until it obtained clear, cogent, and convincing evidence that materialized. Let me ask you this. At the time of the renewal, under Washington law, was there any  clear, cogent, and convincing evidence that materialized? Was there any obligation on the part of Genesis to automatically renew the policy, or could you have said, we're not renewing? There was no obligation automatically to renew. That's correct. And that's why on August 1st, when he banned the underwriter for Genesis, engaged in a series of conference calls with individuals from Cutter and Buck to obtain information that would assist Genesis in making a determination whether or not it would renew or, as in the case of this particular policy, it extended the expiring policy by a year in connection with its August 8th binder. So does the binder, as counsel was arguing, have an independent – provide an independent basis on which entitled – which entitles them to coverage? No. There's one aspect of that that counsel glossed over a bit, and that's that when the – there are two matters. First of all, the original policy that was being extended here was voided ab initio by virtue of misrepresentations that were made in the original  void ab initio as a result of the fraud that occurred in 2001. Second, as counsel noted, binders can be voided for fraud. There was fraud in the application process for the binder here. On the August 1 conference call, Steven Loeber specifically represented to Genesis's underwriter that the distributor transactions were consistent with Cutter and Buck's revenue recognition policy, that he would not have recognized the revenue if they had not been, that the issue that was confronting the company was simply a flip-flop of revenues, that revenues from 2000 were going to be moved into 2001, and that there would be no impact on the financials for the current year, which at that point was fiscal year 2002. Well, since – tell me what are – giving all inferences to the plaintiff or to the appellant in this and with the undisputed facts, you know, what – what do we have in terms of that entitles you for a legal determination on – I guess you've got rescission and waiver and severability issues, right? That's correct, Your Honor. All right. In our view, the facts – and this is what the district court found – the facts are not in dispute. What Genesis knew and when it knew it is not in dispute. And tell us what those are. Certainly. I've already outlined what transpired in the August 1 conference call. There was then a notice of potential claim letter sent on August 7 to Genesis that essentially repeated the version of events that was described to Genesis on August 1. This was simply a matter of moving revenue from one year to another. There was an issue about the creditworthiness of the customers. There was – and that was the issue as to whether or not the revenue ever should have been recognized. There was no suggestion either on August 1 or on August 7 that there was any sort of intentional wrongdoing associated with these transactions. As a result, Genesis bound the coverage on August 8. It issued a letter indicating that it was bound, subject to a more formal letter that would follow. The underwriter was actually on vacation at that juncture, and the formal letter that specified the terms was on August 14. On August 12, the press release is issued. And there's no dispute that the press release disclosed new information that was an issue for Genesis's underwriter. So when she issued the August 14 letter, and its contents are not in dispute, she added contingencies to the binder. She specifically asked for information about the accounting irregularities. She asked Cutter and Buck to provide it with all communications between the auditors and the company's audit committee with respect to the accounting irregularities, and that can only be a reference to what was disclosed on August 12. That was a condition. The binder was conditional. There was clearly no intent in issuing that letter on the part of Genesis to waive. There are other aspects. Wait a minute. Are these all materials as to which the letter says the item required has to be submitted by August 29th, something like that? That's correct, Your Honor. And they did not submit them by August 29th. Didn't you waive that? No, because Genesis followed up. It said Genesis may rescind as of that date. But on September 11th, Genesis sent a follow-up e-mail and said, you know what, you haven't given us everything that we requested, and that includes the information about accounting irregularities. And it was not forthcoming until November 2002. Now, Cutter and Buck's argument suggests that they're trying to set up some sort of cat-and-mouse game here, that if they didn't provide all of the information with Genesis in a timely manner, then it's a kind of gotcha that they can argue that the insurance company has waived, when, in fact, Genesis was pursuing the information. It sends an e-mail from its underwriting department to Cutter and Buck on September 11th.  It's produced to the SEC, asks for a meeting with counsel for Cutter and Buck. It wasn't until the end of October that Genesis received the so-called smoking gun documents, the mea culpa documents. It wasn't until November that Cutter and Buck finally provided all of the information and materials requested in the binder. And it was also in November that Cutter and Buck provided an additional seven boxes of documents that Genesis culled through in addition to the smoking gun documents before making the determination to rescind in early December of 2002. We submit that under those undisputed facts, Genesis clearly did not waive for two different reasons. First, under the Washington standard for waiver, there has to be full knowledge before a party can be deemed to have waived its right. It's clear that as of August 12th, Genesis did not have full knowledge. If the Court reviews the press release, what it suggests is that there are accounting irregularities. It suggests that former management, not identified by name, are no longer with the financials, but it doesn't connect the dots. It doesn't say who from former management did what. It indicates that Mr. Loeber has resigned, but it doesn't say anywhere that Mr. Loeber committed intentional accounting fraud. In fact, there's a couple of aspects of the record below that reinforce the notion that this August 12th press release was insufficient to give Genesis full knowledge of all of its rights. First of all, one of the individuals identified by title as the former CEO, Harvey Jones, maintains to this day that he was not involved in the accounting irregularities. Yet under Cutter and Buck's theory, Genesis was supposed to assume that everybody that was referenced in the press release was somehow culpable here. Second, Cutter and Buck itself, in its arguments below, tried to argue that Genesis committed bad faith by not investigating sufficiently before it made the decision to rescind. And in its opposition to Genesis's motion for summary judgment on the bad faith brief, made the following statement, quote, it was unreasonable for Genesis to rely on documents alone to make the determination that its insurers intended to deceive Genesis, unquote. That's at docket number 227 at page 11. Once again, that position is flatly inconsistent with their position now that Genesis should have made the rash decision based on the August 12th press release alone that it was time to rescind the policy. Genesis required full knowledge under Washington's statute. Well, what just, you know, so that you have an opportunity to address it, what issues are they claiming that are disputed that would prevent you from, you know, summary judgment at this point? Your Honor, I don't think they have identified any factual disputes. Well, I mean, one that I think one that they're saying is that the August 12th press release, that you had knowledge at that point. And the August 12th press release says what it says. And there's no dispute about what the contents of the August 12th press release are. There's also no factual dispute that the August 12th press release does not give, in the words of the Washington case law, full knowledge to Genesis. Genesis had to know by clear, cogent, and convincing evidence. That's a very high standard of proof under the Washington case law that material misrepresentations were made to it with the intent to deceive. And because Genesis was not able to determine based on the press release alone that that had occurred, it clearly did not have full knowledge. There's no factual dispute there. What Genesis's subsequent investigation did reveal is that there was, in fact, intentional deceit on the part of Mr. Loeber. Genesis was provided finally with a copy of the smoking gun document, the mea culpa memo, that Cutter and Buck had had since August, but didn't turn over to Genesis until the end of October. Once it had that unequivocal evidence, Genesis was able to say with certainty under the very high Washington standard that material misrepresentations had been made to it with the intent to deceive on the part of the individual who signed the application. So from our perspective, Your Honor, the district judge got it exactly right. There are no disputed issues of fact. And based on the information that Genesis had in light of the very stringent standard under Washington case law, Genesis acted appropriately and did not waive the right to rescind. How about with respect to severability? Certainly, Your Honor. The district judge got that one right as well. The district judge's reading of the statute. That's a very confusing binder or writer, I guess it is. Writer. I think that the district judge got it right in looking at the provision and, as required under Washington case law, giving meaning to all of its terms. The district judge looked at the two sentences, the three phrases in the provision and made the correct determination that the only way to give the so-called imputation clause meaning was to read the last sentence as imputing knowledge on the part of the signer to the directors and officers. Let me ask you one thing. In the prior policy, in the case of the 2000 policy, there was a severability clause. There was, Your Honor. And one of the others. It doesn't – couldn't – they didn't send a memo or they had a discussion about they wanted severability in the 2001 policy. Something to that effect. I can't remember exactly the exact words. Doesn't that suggest that they were seeking something more than what they had? Well, the record actually – In fact, additional language was proposed. That's correct. And it's the language that actually appears here. It's the language to which Cutter and Buck agreed, and it includes the imputation language. It's incorrect, however, to argue, as Cutter and Buck does, that the new provision didn't add anything. Under the base policy form, there was a general sentence that said that the knowledge that if there are material misrepresentations in the application process or if representations are made with the intent to deceive, this policy is void in its entirety. It then contained a sentence that had a rule about imputation of certain types of knowledge as to other directors and officers. In the base policy. In the base policy. But as the district judge correctly found here, what it lacked and what the new provision added was a specification of what the consequences of imputed or actual knowledge were. The new sentence in the 2001 policy makes sense of the prior two phrases. It indicates that knowledge will be imputed or it indicates that the policy will be void for directors and officers who knew of the untruth. And in light of the prior imputation clause, that can only mean directors and officers who knew of the actual untruths or knowledge of the signer that's been imputed to all of the directors and officers. That was the 2000 policy? The modification I've just described is what was contained in the 2001 policy. It's the one that's at issue here. Well, does this severability have to be a legal matter, whoever wins on it? It is. The severability clause is a legal issue. The interpretation of the severability clause is a legal issue. All right. But if you weren't to get summary judgment on that, then what wouldn't be the legal issue would be some facts that a jury would have to find? Conceivably, Petter and Buck would argue that there are facts that have to be found with respect to that. We submit that there are not. They say if you look at the context in which this provision was negotiated, it suggests that they were seeking full severability, not partial or limited severability. Yes, and let me address that, Your Honor. First of all, the context evidence they're relying on is clearly inadmissible under Washington precedent. It is the deposition testimony, the unilateral views of Genesis's underwriters two years after the fact, and it is clearly not objective evidence of mutual intent. That is the Washington standard. That was the testimony of Ms. Vann, right? That's correct. So that testimony is one way they try and shoot down the imputation clause, but it's not admissible. So that can't give rise to a disputed issue of facts. Well, just explain to me, though, if you weren't to prevail on this issue and, you know, and you have a trial, then what would be determined are those facts, but still severability is ultimately a legal issue. Is that correct? That's correct. Although, again, we submit that that testimony is not relevant evidence. It's not admissible. The only context evidence that's admissible here is the e-mail to which Judge Pius referred. That exchange occurred in August of 2001, and it does not help Kutter and Buck's case. What the e-mail says is simply provide severability to application. It doesn't say full severability. It's undisputed that the term of art for full severability or no imputation is one that he could have but did not use. Ms. Vann responded with a language that was ultimately included, and it clearly has the imputation clause included in it. The knowledge of the signer will be imputed to the other directors and officers. That is the only objective manifestation of intent, and it does not support the proposition that Kutter and Buck was seeking. What happens if you determine that that 2001 rider is ambiguous? Well, first of all, Your Honor, we submit it's not ambiguous because the only reading of the policy that gives meaning to all of its terms requires the imputation of knowledge from the signer to the others. If there's a determination notwithstanding that we think that's the only reasonable reading of the clause, if court were to deem it ambiguous, then there would have to be findings of knowledge with respect to each of the individual directors and officers in order to determine as to whom the policy is rescinded. But, again, we don't believe that Kutter and Buck and the district court correctly found. And those are fact-finding matters. It would be a determination of fact on that level. That's correct. I guess it's not uncommon in the D&O insurance world to have severability clauses, limited, full. I wasn't aware of that until I saw it. There are various forms of severability. The severability that's in this particular policy, so-called partial severability, was actually standard at the time in the marketplace. In fact, it's interesting to note that in the policies issued to the HealthSouth Corporation that were subject to coverage litigation, there was full severability in that the district court in Alabama specifically pointed to the Kutter and Buck decision and contrasted what the court viewed as the clear language of the partial severability clause at issue here with the full severability that the court found in HealthSouth. So I think that reinforces the notion that this particular provision does not give full severability here. There was also a question at one point about the reasons for the increase in the premium, and I just wanted to go back to that because it's important to distinguish between pre-August 12 information and post-August 12 information. The decision to raise the premium according to the undisputed testimony of the underwriter was to address the restatement that she knew was coming. It was the restatement based on a simple flip-flop of revenue, and while she testified yes, it gave rise to a somewhat greater risk. It did not give rise, it did not suggest that there was intentional wrongdoing, which would be something completely different. She also indicated accurately that the market at that point was such that D&O insurance was getting more expensive. We had just had at that point in time the collapses of Enron, WorldCom, so it's not surprising that the marketplace for D&O insurance was reacting, and that's another reason underlying the increased premium. I see that my time is nearly up, so I just ---- Well, the appellants also, I want to make sure I completely understand. They alleged error on certain documents involving attorney-client privilege. Yes, Your Honor. What is your understanding of their exact contention of error? It's a little bit murky, Your Honor. They argue that the documents should not be deemed privileged, although the record is undisputed that the Genesis Claims attorneys provided legal advice to underwriters when legal issues arose. Genesis submitted affidavits from the relevant individuals supporting the proposition that the underwriter was seeking legal advice from the claimants. Do we need to look at the in-camera review in order to resolve that issue, whether the court was correct, or is their attack a more general ---- is it sort of a more general one in that corporate attorneys don't have any privilege? Well, certainly with respect to that proposition, Your Honor, there's no dispute that that's wrong. I mean, the case law is clearly that corporate attorneys are entitled to invoke the privilege. We submit that the record is clear enough that Genesis supported its claim of from the individuals involved, the attorneys in the claims department, as well as Ms. Vann. Certainly, the district court did not take Genesis's work for it, and she personally reviewed the documents and concluded that Genesis is ---- I gather those documents were just lodged with the district court because they're not part of the record. That's correct, Your Honor. And they were returned? As I understand it, the district court destroyed them after she reviewed them. Those documents are still available. That's correct, Your Honor. Is it clear that these folks were actually working in a lawyer capacity? Or were they just claims agents who happened to have law degrees? No, they were acting in their claims capacity in connection with these transactions. What the undisputed record shows that when legal issues arose for underwriters, underwriters used Genesis's in-house capabilities, the lawyers in the claims department to seek that legal advice. And in this case, it was only with respect to specific questions that arose on legal issues that Genesis claimed the privilege. Genesis did not claim the privilege when these individuals were acting in business capacities. In fact, Mr. Hackle had testified in a deposition at length about his role in connection with business aspects of these transactions, as did Ms. Shaver, who was also one of the attorneys who was involved in these communications. Ms. Shaver was testified twice by deposition here. So the record would show that as part of their duties, they were obligated to render legal advice? That's correct, Your Honor. And that's supported by the affidavits that they submitted. Well, apparently the plaintiff's contention is that, well, as to what really happened where, you know, they weren't discussing the legal issues, but they were discussing the business side. And I guess that's the reason why the district court undertook an in-camera review, right? To determine whether or not, in fact, legal advice within the scope of that lawyer's duty was involved. Then why the district court undertook an in-camera review of the documents? I'm not aware that the district court gave any reasons for requesting an in-camera review. You don't know why the district court requested an in-camera review? One could assume that she wanted to test Genesis's assertions of privilege on her own. And you submitted a stack of documents? That's correct, Your Honor. How big a stack was it? Well, the ones that remain at issue at this point are, my best estimate is something in the range of 10 to 12 pages. So my question is, how big a stack did you submit? It was larger. There were certain documents that she ordered Genesis to produce that it had withheld. But, again, it was a modest number of documents. It was, again, I'm going to say in the 15 to 20 pages range. So you submitted about 20 pages. And out of that 20, the district court determined, what, half of it was subject to the privilege? Something in that range, Your Honor. And the half that the district court held subject to the privilege, what happened to those? Where are they? I know what you're trying to get at. And I think Karen Buck's position still is that, well, you know, it shouldn't have been withheld because they were just giving business advice. And you say, no, the district court is correct. But how can we decide at issue without looking at the documents? Well, certainly Genesis supported this assertion of privilege with the affidavits of the individuals involved. And we submit that those affidavits are sufficient.  The documents themselves shouldn't be privileged because they don't contain legal advice. Right? That's a contention. So how can we determine whether that's a correct, you know, whether that contention has any merit unless we look at the documents? Based on the affidavits of the individuals involved who specify. But that's sort of what the fox watching the chicken coop or whatever. But, you know, that's what I'm trying to ascertain. Is their attack just that those lawyers can't, you know, they can't have the attorney-client privilege? That being the case, we can resolve it without the documents. But if their attack is also they can't have privilege, but then we're also saying that what the court did, you know, there's still probably some, we want to make sure there's nothing that we should have gotten that the court didn't give us. They've mounted a waiver argument, which is a legal argument. They've argued that Genesis somehow waived the privilege by virtue of the fact that the rescission decision was made. But, in fact, Genesis has not placed its attorney-client. So is that the issue that I guess is the issue that we have to decide, that they waived the attorney-client privilege because they claimed rescission? That's correct, Your Honor. They're not going to what was in those documents or whether they got everything. That's a different argument. That's an additional argument, isn't it? Yes, I think there's actually two separate arguments. One argument is that, well, these documents don't contain legal advice. And two, that in any event, it's waived because they submitted the declarations of these people. That's correct, Your Honor. And with respect to the first argument, we submit that the declarations that Genesis submitted adequately support the assertion of privilege. With respect to the second argument as to waiver. Can I make that argument to the district court? No, you don't have to look at it because the declarations are sufficient? My recollection, Your Honor, is that we submitted everything on the briefing. She requested the documents and reviewed it, and then she ruled. With respect to the waiver, we submit that there has been no assertion that somehow that advice gives Genesis any benefit here. There's no assertion that, for example, the advice reliance on counsel is a defense  Well, but that's not a decision for you to make. In other words, if you involve privilege with respect to somebody's deposition, you can't then have that person come and testify. And Genesis did not testify in the depositions about the legal advice. That was the one area in the depositions that was carved out. The individuals who were involved were instructed not to answer questions that would reveal the legal advice that was sought and rendered in the particular instances that are at issue here. Thank you, counsel. I appreciate your argument. It's undisputed, and Genesis did not contend otherwise, that the district court found that Genesis knew enough to rescind after reviewing the press release. That's August 12th. That's correct, Your Honor. Well, but is that a legal determination? I mean, we have the document, and we have to look at what the law was. And is that document, when we look at it? What the court was talking about was rescinding the expired policy. So that finding is relevant in connection with Genesis' decision to issue the policy binder two years later, because it demonstrates unequivocally that Genesis was not misled and not fraudulently induced to issue the August 14 binder. Let's step back a minute and just review the options that Genesis had while it was reviewing the press release. First of all, it could have refused not to renew, refused to go forward. It could have revoked its August 1 indication and its August 8 preliminary binder, because it had reserved the right in both of those documents not to go forward if there was a material adverse change after the August 1 conference call. Could it have been sued for a bad faith? No. Decision there? No. It's hard to imagine something that's more materially adverse than a public confession to the world in a press release that you've discovered former management intentionally cooked the books and committed accounting fraud. Cutter and Buck could not come into the district court or this court and claim that Genesis' refusal to go forward with the renewal was in bad faith after the honest, blunt, and shocking press release had been issued. So apart from not going forward, Genesis had other options. It could have deferred any decision pending an investigation. There was nothing that prevented Genesis from picking up the phone and calling Cutter and Buck and asking, what information do you have about this press release? In the August 7 notice of potential claims letter, Cutter and Buck's CEO had invited Genesis to call her if it had any questions. On August 19, after it issued the August 14 binder, Genesis wrote Cutter and Buck directly reaffirming that it had coverage. It made no requests for information. Genesis could have asked the broker to set up another conference call. It could have hired counsel. It had any number of ways in which it could have investigated what the press release disclosed. Mr. Tandish stood up there and just said, well, you know, the documents weren't submitted by August 29, but they knew that we kept requesting those documents and we expected to get them. That's true. And on September 11th, Genesis e-mailed Cutter and Buck's broker thanking the broker for the renewal application and the materials that had already been submitted and requested the remaining. But Genesis did not invoke the rescission option. On October 16th, Genesis' outside counsel wrote Cutter and Buck's counsel asking for a meeting to talk about the securities lawsuits and the defense of those lawsuits. In that letter, there's no mention that Genesis is conducting an investigation of rescission, and instead the letter suggests that Genesis is going to be defending or reimbursing the defense of the securities lawsuits under a reservation of rights letter. During this entire period of time, Cutter and Buck has no idea that Genesis is investigating rescission. It surely isn't disclosed in the August 14 binder letter that Genesis is even considering rescission. On November 6th, those remaining application materials are provided to Genesis, and when Genesis sends its rescission notice on December 6th, it does not rescind because those materials were too late, because they were unsatisfactory, or based on any condition in the binder. Instead, what Genesis did was rescind the expired policy on the basis that the representations in the renewal application for that policy were false and the financial statements submitted with it were false. But that policy is irrelevant at that point because Genesis knew it had been misled when it issued that prior policy on August 12th. The press release told it that. And with that knowledge, Genesis went ahead and issued the August 14 renewal binder. You don't have too much time left. I don't think the first time around you addressed, you know, very much the issue of severability. You want to address that for a second? Well, the Court need not reach the severability issue if it rules that Genesis breached the binder. Right. But it's clear in the transcontinental insurance case, the Washington Supreme Court refused to interpret an endorsement to a policy in such a way that it would render the endorsement meaningless. And what Genesis is asking you to do and what the district court did was interpret that endorsement, despite the extrinsic evidence showing that it was the party's mutual intent that the endorsement provide broader coverage than the base policy. Genesis is asking you to interpret that endorsement so that it's exactly the same coverage as already provided in the base policy, thereby rendering it meaningless and the party's negotiating of it pointless. And that is just not the – those are not the rules of policy construction in the State of Washington. So what happens? You have to have a trial over the facts relating to the context within which this particular provision was negotiated? Well, weren't you seeking a – you had cross motions for summary judgment, right? We did. We moved for partial summary judgment, asking the court to declare that the rescission was wrongful and breached the terms of the policy binder. If there's a trial here, then a jury would decide, first of all, whether Genesis breached the terms of the policy binder. Well, it would have to decide first the meaning of the provision, right? Well, the – the court can decide as a matter of law the interpretation of the severability endorsement because the extrinsic evidence is undisputed. So your position is that the severability issue can be decided by us now on this record as a matter of law? That's correct, Your Honor. They dispute what happened in the context, in the negotiation of that clause. They do not. Mr. Standish admitted that the e-mail exchange between the Genesis underwriter and the Cutter and Buck broker was admissible. What he was claiming was inadmissible was Ms. Vann's interpretation of the endorsement at her deposition before she was coached by her lawyer during the lunch hour to recant that interpretation. But the extrinsic evidence is undisputed. Ms. Vann, who was the Genesis underwriting manager, testified that she knew from the e-mail from the broker that he wanted broader coverage than the base policy provided, and she acceded to his request with endorsement language that had been approved by Genesis headquarters for select accounts that Genesis wanted to keep. And the only way the base policy can provide broader or enhanced coverage is if the endorsement is interpreted as full severability. Full severability? The base policy already provided partial severability. And the only way that base policy could be modified, which is what an endorsement is supposed to do, is if the endorsement provided full severability. And Genesis has not provided any interpretation of the endorsement that does anything to the base policy. The only way you can make that endorsement operationally meaningful is to interpret it to provide full severability. You've exceeded your time. Thank you. Thank you. We appreciate the arguments in this case. The matter is submitted.
judges: Tashima, Paez, Callahan